**Case No. 17-30056**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,
Plaintiff-Appellee,**

**v.**

**ENRIQUE MATOS-HERRERA,
Defendant-Appellant.**

**On Appeal from the United States District Court
for the District of Idaho**
_____

**APPELLANT'S OPENING BRIEF**
_____

**Dartanyon G. Burrows
MASSOTH & BURROWS
14 S. Main Street, Suite 200
P.O. Box 1003
Payette, Idaho 83661
(208) 642-3797**

**Attorney for Appellant**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF JURISDICTION......................................................1

BAIL STATUS ..................................................................................1

STATEMENT OF THE ISSUE...........................................................2

STATUTORY PROVISION INVOLVED ...........................................2

STATEMENT OF THE CASE.............................................................3

STATEMENT OF FACTS ...................................................................4

SUMMARY OF THE ARGUMENT ..................................................11

ARGUMENT ....................................................................................12

    I.    THE EVIDENCE TO SUPPORT THE CONVICTIONS FOR
        AGGRAVATED IDENTITY THEFT WAS LEGALLY INSUFFICIENT
        ................................................................................................11

    II.    THE EVIDENCE TO SUPPORT THE CONVICTION FOR
        CONSPIRACY TO COMMIT WIRE FRAUD AND THE WIRE
        FRAUD COUNTS WAS LEGALLY INSUFFICIENT ..........................18

    III.    THE OTHER ACT EVIDENCE CONCERNING PRIOR
        FRAUDULENT TRIPS WAS INADMISSIBLE PURSUANT TO I.R.E.
        404(b) AND 403 .....................................................................20

        A. The District Court Erred In Admitting The Testimony Of A Cooperating
           Defendant Concerning Prior Fraudulent Trips........................................20

        B. The District Court's Error was Not Harmless.........................................25

CONCLUSION..................................................................................25

STATEMENT OF RELATED CASES ................................................26

CERTIFICATE OF COMPLIANCE ......................................................................27

CERTIFICATE OF SERVICE ..............................................................................28

# TABLE OF AUTHORITIES

**CASES:**

*Flores-Figueroa v. United States*, 556 U.S. 646 (2009)................................. 13, 17

*Jackson v. Virginia*, 443 U.S. 307 (1979)................................................12

*Obrey v. Johnson*, 400 F.3d 691 (9th Cir. 2005) ....................................25

*United States v. Banks*, 514 F.3d 959 (9th Cir. 2008) ............................21

*United States v. Bazuaye*, 240 F.3d 861 (9th Cir. 2001) ........................12

*United States v. Jackson*, 72 F.3d 1370 (9th Cir. 1995) .........................12

*United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997)........................25

*United States v. Romero*, 282 F.3d 683 (9th Cir. 2002) .........................20

*United States v. Tucker*, 133 F.3d 1208 (9th Cir. 1998).........................12

**STATUTES:**

18 U.S.C. § 1028(d)(7)...............................................................13

18 U.S.C. § 1028A ......................................................... 1, 2, 4, 12

18 U.S.C. § 1343 ...................................................... 1, 2, 3, 4, 18

18 U.S.C. § 1349 ............................................................. 1, 2, 4

28 U.S.C. § 1291 ..........................................................................1

**RULES:**

F.R.E. 403 ............................................................ 19, 22, 24

F.R.E. 404(b)................................................ 19, 20, 21, 22, 24

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction for this case pursuant to Title 18, Sections 1343, 1349, and 1028A of the United States Code, as it involved offenses against the laws of the United States, specifically those prohibiting conspiracy to commit wire fraud, wire fraud, and aggravated identity theft. On December 5, 2016, a jury found Enrique Matos-Herrera ("Mr. Matos") guilty on Count 1, conspiracy to commit wire fraud. The jury found Mr. Matos guilty on Counts 8, 9, 10, and 11, for wire fraud. The jury also found Mr. Matos guilty on Counts 31, 32, 33, and 34, for aggravated identity theft. Excerpts of Record ("ER"), Vol. II, p. 169. The Judgment in a Criminal Case was entered on March 15, 2017. ER, Vol. I, p. 3. A timely Notice of Appeal was filed on March 24, 2017. ER, Vol. I, p. 1. This Court has jurisdiction pursuant to United States Code Title 28, Section 1291, as the Judgment in a Criminal Case is a final decision subject to appeal. 28 U.S.C. § 1291.

## BAIL STATUS

Mr. Matos is in the custody of the Bureau of Prisons and serving his sentence in Hinton, Oklahoma at CI Great Palins. His anticipated release date is May 18, 2020.

## STATEMENT OF THE ISSUE

1.  WHETHER THE EVIDENCE TO SUPPORT THE CONVICTIONS
    FOR AGGRAVATED IDENTITY THEFT WAS LEGALLY
    SUFFICIENT?

2.  WHETHER THE EVIDENCE TO SUPPORT THE CONVICTION
    FOR CONSPIRACY TO COMMIT WIRE FRAUD AND THE
    WIRE FRAUD COUNTS WAS LEGALLY SUFFCIENT?

3.  WHETHER THE DISTRICT COURT ERRED IN RULING OTHER
    ACT EVIDENCE CONCERNING PRIOR FRAUDULENT TRIPS
    WAS ADMISSIBLE PURSUANT TO I.R.E 404(b)?

## STATUTORY PROVISION INVOLVED

Pursuant to 18 U.S.C. § 1028A(a)(1):

Whoever, during and in relation to any felony violation enumerated in
subsection (c), knowingly transfers, possesses, or uses, without lawful
authority, a means of identification of another person shall, in addition
to the punishment provided for such felony, be sentenced to a term of
imprisonment of 2 years.

Pursuant to 18 U.S.C. § 1349:

Any person who attempts or conspires to commit any offense under
this chapter shall be subject to the same penalties as those prescribed
for the offense, the commission of which was the object of the attempt
or conspiracy.

Pursuant to 18 U.S.C. § 1343:

Whoever, having devised or intending to devise any scheme or artifice
to defraud, or for obtaining money or property by means of false or
fraudulent pretenses, representations, or promises, transmits or causes
to be transmitted by means of wire, radio, or television
communication in interstate or foreign commerce, any writings, signs,
signals, pictures, or sounds for the purpose of executing such scheme
or artifice, shall be fined under this title or imprisoned not more than

2

20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistant Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

## STATEMENT OF THE CASE

The Government charged Mr. Matos and his codefendants, Alejandro Hidalgo ("Hidalgo"), Dilcia Martinez-Marquez ("Martinez"), Jose Salazar-Quintana ("Salazar"), Luiz Meijas-Fiz ("Fiz"), and Eslay Monzon ("Monzon") with conspiracy to commit wire fraud, wire fraud, and aggravated identity theft.[1]

The six individuals were alleged to have used access devices, or gift cards, which had been re-encoded with stolen credit card account numbers, at various retail stores in and around Boise, Idaho.

Mr. Matos, Hidalgo, Martinez, and Salazar proceeded to jury trial, while Fiz and Monzon entered into plea agreements with the Government and testified against the codefendants at trial. The jury found Mr. Matos, Hidalgo, Martinez, and Salazar guilty of all charges.

The district court sentenced Mr. Matos to serve 24 months on each of Counts One (conspiracy to commit wire fraud) and Eight through Eleven (wire fraud), to be served concurrently, and 24 months on each of Counts 31 through 34

---

[1] Martinez was the only defendant not charged with aggravated identity theft.

(aggravated identity theft), to be served concurrently with each other but consecutive to the terms imposed on Counts One and Eight through Eleven. The total term of imprisonment imposed on Mr. Matos was 48 months.

Mr. Matos' appeal followed.

## STATEMENT OF FACTS

On December 8, 2015, Mr. Matos was indicted on one count for conspiracy to commit wire fraud pursuant to 18 U.S.C. §§ 1343 and 1349, four counts of wire fraud pursuant to 18 U.S.C. § 1343, and four counts of aggravated identity theft pursuant to 18 U.S.C. § 1028A. ER, Vol. II, p. 170. A six-day jury trial was held on the 28th, 29th, and 30th of November, 2016, and the 1st, 2nd, and 5th days of December, 2016.

The investigation of Mr. Matos began on October 16, 2015. On that date, after receiving reports of suspicious activity taking place at a Walgreens retail store in Meridian, Idaho, law enforcement arrested Mr. Matos, Hidalgo, Martinez, Salazar, Fiz and Monzon in the parking lot of an O'Reillys in Meridian, Idaho. ER, Vol. I, pp. 22-27. The six suspects were travelling in a Suburban, driven by Monzon. *Id*. at pp. 28-29. Law enforcement could see numerous shopping bags and vehicle parts through the windows of the Suburban. *Id*.

Law enforcement searched the Suburban. *Id*. Inside the vehicle was a blue HP laptop, as well as a credit/debit card reader/encoder. *Id*. at p. 29. Various gift

4

cards were also found in multiple locations inside the vehicle. *Id*. at pp. 31-32. A brown wallet was located inside the vehicle. *Id*. at pp. 33-35. The brown wallet contained two Walmart gift cards, a child card with the last name of Monzon, a Social Security card for Mr. Eslay Monzon, two Applebee's cards, and an envelope for a motel room key at Super 8. *Id*. at p. 35.

The Super 8 was located in Boise, Idaho, and two rooms, room 219 and room 220 were booked under Salazar's name. *Id*. at pp. 35; ER, Vol. II, p. 132. The two rooms were searched pursuant to a warrant. ER, Vol. I, p. 44.

Mr. Matos, Hidalgo, Martinez, Salazar, Fiz, and Monzon were taken into custody and interviewed by Detective Kulack, with the assistance of a Spanish interpreter. *Id*. at p. 45. At the time Mr. Matos travelled to Idaho, he could not speak English. Id. at p. 52: ER, Vol. II, pp. 122, 135. He is from Cuba, and had only been living in the United States for approximately four months. ER, Vol. II, p. 122.

During the interviews, Detective Kulak learned that all six individuals lived in Texas and they traveled to Idaho together in two vehicles. ER, Vol. I, pp. 46, 48, 51. The primary purpose of the trip to Idaho was to attend a baby shower that Martinez' cousin was having for her. *Id*. at p. 51. All six individuals knew each other. *Id*. at p. 49. Martinez and Hidalgo were married. *Id*. at p. 47. Hidalgo was Fiz' uncle. *Id*. at p. 48.

He stated that he was friends with Hidalgo, and he came to Idaho from Texas for Martinez' baby shower. *Id*. at p. 50. It was his first time in Idaho. *Id*. at pp. 52-53. Mr. Matos advised it was normal that he would be invited on this trip because he was friends with Martinez and Hidalgo. *Id*.

During the course of his initial investigation, Detective Kulack discovered that the suspected individuals were using credit cards numbers to make purchases in the Boise, Idaho area, primarily at Walmart retail stores. ER, Vol. II, pp. 150-51.

Don Ankenman, an Asset Protection Manager for a Walmart in Meridian, Idaho testified he was contacted by Detective Kulack about possible credit card fraud at his store. ER, Vol. I, pp. 54, 55. Detective Kulack gave Ankenman approximately 12 credit card numbers suspected to have been used at the Walmart without authorization from the owner. *Id*. at p. 56. Ankenman was able to locate the transaction records for his store using the credit card numbers provided. *Id*. Ankenman testified, when a transaction is made at a terminal requiring a signature from the purchaser, the screen displays only the signature, not the cardholder's name. Id. at pp. 57-59, 60. Ankenman was able to find the point of sale videos associated with transactions Detective Kulack requested. *Id*. at p. 59. Video evidence from the transactions were introduced into evidence.[2] The videos of the

---

[2] Throughout trial, the Government introduced transaction records, video evidence, and still images from various Walmart and Walgreen stores in the Boise, Idaho area. ER, Vol. I, pp. 19-21, 37-43; ER, Vol. II, pp. 99-121, 147-49.

transactions did not show what type of card was being used or what, if any, name was embossed on the card used to make purchases. ER, Vol. I, p. 61. The only way to determine a name associated with the transaction and card being used was to look at the electronic receipt from the bank. *Id*. at p. 61-63. According to Ankenman, customers do not get a copy of that record. *Id*. at p. 60.

Fiz testified on behalf of the Government based upon a plea agreement. ER, Vol. II, pp. 78-81. He knew Mr. Matos through Salazar. Fiz saw Monzon every day because they were coworkers. *Id*. at p. 82. Fiz admitted he went to Idaho to commit credit card fraud and that he had done this on prior occasions. *Id*.

Over defense counsel's objection, the Court permitted Fiz to testify that he had been on prior trips to commit fraud with Mr. Matos. *Id*. at pp. 64-80, 84-85. Fiz also testified that he had been on prior fraud trips with each of the defendants. *Id*. at pp. 83-85. Fiz testified that all of the defendants went on prior fraud trips with him to Oklahoma, Kansas, Lubbock, Utah, and Montana. *Id*. at p. 118. He contacted Monzon to go on the trip to Idaho because he spoke English. *Id*. at p. 86. Fiz brought the blue HP laptop to Idaho, and testified that Salazar brought another laptop on the trip. *Id*. at p. 87. He admitted the encoding device was his, and he brought it from Texas. *Id*. at pp. 88-89. They travelled to Idaho in a Cadillac and a Suburban. *Id*. at p. 90.

When they arrived in Idaho, they booked two rooms. Fiz and Monzon stayed in one room, and Mr. Matos, Hidalgo, Salazar, and Martinez stayed in the other room. *Id*. at p. 91. While in the Boise area they travelled to various Walmarts in the Suburban and Fiz brought his encoding device. *Id*. at p. 92. Fiz testified that he would get card numbers from the internet and use his encoder to put the card numbers on gift cards. *Id*. at p. 93. Fiz testified he was purchasing gift cards at the various Walmarts to sell over the internet. *Id*. at p. 94. He testified that he obtained credit card numbers from a website on the internet called Rescator. *Id*. at p. 95. According to Fiz, the other defendants did not use his Rescator account to access credit card numbers. *Id*. at p. 96. Fiz shared his account with Monzon. *Id*. at p. 125. He denied that Mr. Matos had his own account. *Id*. at p. 97. However, he alleged Mr. Matos used the encoding device. *Id*. at p. 98.

Fiz testified that he uses MoneyGrams to deliver payment to the Ukraine to pay for the fraudulent credit card numbers he purchased. *Id*. at p. 69. Fiz instructed Monzon to send money to the Ukraine using MoneyGram. *Id*. at pp. 136-38. A MoneyGram transaction receipt for money sent to the Ukraine was discovered in the Suburban. The receipt had Monzon's name as the sender. ER, Vol. I, p. 30; ER, Vol. II, pp. 139-40.

Monzon testified for the Government that he previously conducted schemes using re-encoded cards with Fiz on 10 to 15 occasions. ER, Vol. II, pp. 126-27.

8

Monzon had never went with any of the other defendants to commit fraud, other than with Fiz. *Id*. at p. 127. Fiz asked Monzon to go on the trip and be his partner in purchasing gift cards, and would pay Monzon on the basis of what he made. *Id*. at pp. 129-30. Mr. Matos did not talk to Monzon about going on previous trips. *Id*. at p. 128. Monzon testified that he observed all the defendants, with the exception of Martinez, swipe cards through the encoding device while they were in the Suburban. *Id*. at pp. 131-32.

Approximately 107 gift cards were seized in this case. *Id*. at pp. 155-56. Law enforcement examined each card, and found that approximately 14 of these gift cards were re-encoded with different account numbers. *Id*. None of the fraudulent cards found during the investigation had any names embossed on them. *Id*. at p. 152.

Detective Kulack testified that the wallet found on Mr. Matos contained four Walmart gift cards; one prepaid debit Visa card; three prepaid debit Mastercards; and one Super 8 motel key. *Id*. at p. 153. The Mastercards did not have a name on them, they displayed "Gift for you." *Id*. at p. 154. Similarly, the Walmart gift cards did not have an individual's name on the front. Detective Kulack agreed that none of the cards discovered in Mr. Matos' wallet had re-encoded account numbers on them. *Id*.

Forensic analysis was conducted on the electronic evidence. The blue HP laptop discovered in the Suburban had been connected to the encoding device on October 16, 2015. *Id*. at pp. 157-58. Examination of the blue HP laptop and the black HP laptop revealed that approximately 95 percent of the credit card numbers connected to the transactions in this case were on the blue HP laptop, and none of the numbers were found on the black HP laptop. *Id*. at pp. 159-62PP.

After presenting expert testimony concerning electronic evidence that was seized and analyzed, the Government rested. *Id*. at p. 163.

Defendants moved for judgment of acquittal. Mr. Matos argued for an acquittal on all counts. *Id*. at p. 164. As to Count I, conspiracy to commit wire fraud, and Counts 8 through 11, wire fraud, there was no showing of an agreement between Mr. Matos and any other codefendant to commit wire fraud, or an intent to defraud. Similarly, as to Counts 31 through 34, aggravated identity theft, there was no showing of knowing use of another person's identification. *Id*. at p. 165.

The district court ruled "there are issues of fact to be resolved by the fact finder, the jury" and denied all defense motions. *Id*. at p. 166. Defendants rested without presenting any witnesses. *Id*. at pp. 167-68.

After deliberating for approximately two hours, the jury found the defendants guilty of all the charges. After the jury returned its verdict, the

Government timely notified defense counsel that the jury foreperson delivered a handwritten note to the Government, which stated:

> Prosecution,
>
> We as the jury didn't use Luiz or Munoze [sic] testimony in our verdict. We did not believe them in the least. We all believe that they do not deserve a plea deal.

[Dkt. 232-1]

At sentencing, the district court sentenced Mr. Matos to serve a total term of imprisonment of 48 months.

Further reference to the record appears in the argument portion of this brief.

## SUMMARY OF THE ARGUMENT

Mr. Matos submits the Court should find there was insufficient proof to establish he knowingly used without legal authority a means of identification of another person, or had knowledge the means of identification belonged to a real person. Thus, his aggravated identify theft convictions should be dismissed. Further, there was insufficient evidence to prove the conspiracy and wire fraud convictions. There was no evidence that he agreed to become a member of a wire fraud scheme or knew of its objectives and intended to help, or that he knew he was participating in a scheme to defraud with the specific intent to defraud. Finally, the district court erred in admitting other act evidence testimony

concerning prior fraudulent trips, and this error was not harmless. Therefore, his convictions should be reversed.

## ARGUMENT

### I. THE EVIDENCE TO SUPPORT THE CONVICTIONS FOR AGGRAVATED IDENTITY THEFT WAS LEGALLY INSUFFICIENT

"There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Bazuaye*, 240 F.3d 861, 863 (9th Cir. 2001); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *United States v. Jackson*, 72 F.3d 1370, 1381 (9th Cir. 1995). When the issue of sufficiency of the evidence is preserved by making a motion for acquittal, the Court reviews the district court's denial of the motion de novo. *United States v. Tucker*, 133 F.3d 1208, 1214 (9th Cir. 1998).

Counts 31 through 34 charged Mr. Matos with aggravated identity theft. ER, Vol. I, p. 3. The penalty for aggravated identity theft is a mandatory consecutive two-year prison term. 18 U.S.C. § 1028A.

The elements of aggravated identity theft are as follows:

1. The defendant knowingly used without legal authority a means of identification of another person;

2. The defendant knew that the means of identification belonged to a real person; and

3. The defendant did so during in and relation to a felony enumerated in 18 U.S.C. § 1028A(c).

ER, Vol. I, p. 15; *See Flores-Figueroa v. United States*, 556 U.S. 646 (2009).

The term "means of identification of another person" is defined as:

Any name or number that may be use, alone or in conjunction with any other information, to identify a specific individual, including any name, social security number, date of birth, official State or government issued driver's license or identification number.

18 U.S.C. 1028(d)(7).

Mr. Matos contests whether the evidence sufficiently established the three elements of aggravated identity theft. Based upon the evidenced introduced at trial, there is no credible evidence Mr. Matos knew that stolen credit card numbers were encoded on the cards he used. There was no evidence presented that Mr. Matos saw the files on Fiz' blue HP laptop which had accessed the Rescator website, and was used to purchase the credit card numbers.

Both Fiz and Monzon entered into plea agreements and testified against the remaining codefendants at trial. According to the foreperson's written note, the jury did not find their testimony credible and the jury disregarded their testimony

in reaching its verdict. There is insufficient evidence to support Mr. Matos'
conviction based upon the credible evidence presented.

Fiz implicated Mr. Matos in the charged crimes by testifying: 1) Mr. Matos
had been on prior trips with Fiz; and 2) he had witnessed everyone swipe cards on
his encoding device, except Martinez. Monzon testified that he witnessed everyone
swipe cards, with the exception of Martinez. As indicted by the jury foreperson,
their testimony was not credible.

First, Mr. Matos had only been in the United States for approximately four
months at the time of his arrest on October 16, 2015. Mr. Matos was from Cuba.
ER, Vol. II, p. 122. After the defendants were arrested, Fiz interviewed with law
enforcement on four separate occasions. *Id*. at pp. 120-21. During these interviews,
Fiz said that he had been on prior fraudulent trips to Oklahoma, Kansas, Lubbock,
Utah, Montana, and Idaho with all the defendants, including Monzon. *Id*. at pp.
117-19. However, Fiz could not remember the approximate dates when he went on
any of these prior trips with Mr. Matos. *Id*. at p. 123. Fiz eventually agreed Mr.
Matos could not have been on a previous trip to Kansas in 2013 or 2014 because
he would have been in Cuba. *Id*. at pp. 124-25.

Monzon testified for the Government that he previously conducted schemes
using re-encoded cards with Fiz on 10 to 15 occasions. *Id*. at pp. 126-27. Contrary
to Fiz' testimony, Monzon denied ever going with any of the other defendants to

commit fraud, other than with Fiz. *Id*. at p. 127. According to Monzon, Mr. Matos never spoke to Monzon about going on previous trips. *Id*. at p. 128. Monzon testified that the first time he fraudulently used a credit card was in Lubbock, Texas on or about 2014. He was with Fiz on that occasion. *Id*. at pp. 144-45. According to Monzon, Fiz taught him how to fraudulently use credit cards. *Id*.

Even though Fiz and Monzon testified that they observed Mr. Matos encode credit cards, their testimony is not credible. According to Monzon, he, Fiz, and Mr. Matos traveled together in the Suburban from Texas to Idaho. The blue HP laptop and the encoding device were in the suburban while the defendants made their trip to Idaho. Fiz and Monzon were on probation and Fiz did not want those items in the Suburban, in case they were pulled over by law enforcement. *Id*. at p. 130. Mr. Matos would not have had access to the blue HP laptop or encoding device while traveling to Idaho. While in Idaho, both Fiz and Monzon testified that they witnessed Mr. Matos swipe cards while traveling in the Suburban. However, Monzon was driving the Suburban while in Idaho. *Id*. at p. 134. More importantly, Monzon testified that he witnessed Fiz encoding cards inside Fiz and Monzon's hotel room. *Id*. at p. 146. According to Monzon, Fiz did this prior to going to Walmarts so they would have them ready to use. Monzon agreed it was not necessary to encode cards while traveling in Boise. *Id*. It makes sense that Fiz and

Monzon would not have encoded cards while traveling in the city of Boise, such activity would appear suspicious and draw unwanted attention.

Both Fiz and Monzon had great incentive for testifying falsely against their codefendants. They both acknowledge that based upon their testimony, they could potentially receive lower sentences. Id. at pp. 65, 141. Unlike their codefendants, they both had similar fraud charges pending in Texas, and they were both on probation. Fiz was on probation for selling diesel at the time of his arrest, and Monzon was a codefendant in that case. None of the other defendants were codefendants in the diesel case. *Id*. at pp. 116-17. They also had time and opportunity to discuss potential testimony against their codefendants. Fiz and Monzon were in the same jail cell for approximately one month, and had discussed the topic of testifying against their codefendants at trial. *Id*. at pp. 142-43.

At the time of his arrest, Mr. Matos did <u>not</u> have stolen credit card numbers encoded on any of the cards found on his person. Even assuming arguendo that Mr. Matos at some point possessed cards that had encoded credit card numbers, there is no evidence that any of the cards Mr. Matos possessed had another individual's name embossed on the card, or evidence that another individual's name was on a receipt or screen that Mr. Matos saw. Even if another individual's name was presented, Mr. Matos does not speak English. He needed a translator when police interviewed him, and he had only been in the United States for approximately four

months at the time of his arrest. When asked about his reason for coming to Idaho, he explained he was invited by his friends Hidalgo and Martinez to attend a baby shower.

In *Flores-Figueroa*, the defendant gave his employer counterfeit identity documents including a social security number belonging to someone else. 556 U.S. at 648-49. The Court held this evidence, alone, was not enough to establish intent to use a number belonging to another person. *Id*. at 649-57.

At most, the evidence showed Mr. Matos was using cards supplied to him that had been purchased by someone using the blue HP laptop, which Fiz admitted to owning and using. Mr. Matos' conduct in this regard was similar to the defendant in *Flores-Figueroa*. There is no credible evidence Mr. Matos knew he was using the means of identification of another person. Moreover, if he received these cards from one of the codefendants, there is no credible evidence he did not have legal authority to use these cards.

The Court should find there was insufficient proof to establish he knowingly used without legal authority a means of identification of another person, or had knowledge the means of identification belonged to a real person. The Court should vacate Mr. Matos' conviction on Counts 31 through 34, for aggravated identity theft.

## II.  THE EVIDENCE TO SUPPORT THE CONVICTION FOR CONSPIRACY TO COMMIT WIRE FRAUD AND THE WIRE FRAUD COUNTS WAS LEGALLY INSUFFCIENT.

At trial, the district court instructed the jury that to convict Mr. Matos of conspiracy to commit wire fraud, the Government must prove:

> There was an agreement between two or more persons to commit wire fraud as charged in the Indictment;
>
> Second, the named Defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and
>
> Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

ER, Vol. I, p. 10.

To be convicted of wire fraud, the Government must prove a defendant knowingly participating in a scheme to defraud and acted with the specific intent to defraud. *See* 18 U.S.C. § 1343; ER, Vol. I, p. 11.

The Court should find there was insufficient proof to establish Mr. Matos agreed to become a member of a wire fraud scheme or knew of its objectives and intended to help. While Mr. Matos may have traveled to Idaho with his codefendants and can be seen on video evidence at various Walmart stores, there is no credible evidence he knew or agreed to commit wire fraud with any of his codefendants. There was no evidence presented at trial that Mr. Matos discussed

going to Idaho to commit wire fraud, or that he knew the purpose of the trip and agreed to assist.

At trial, the Government failed to establish Mr. Matos devised a scheme to defraud or knew that his codefendants devised such a scheme. The evidence produced at trial was that no one looking at the gift cards could tell they were fraudulent cards. The cards found on Mr. Matos' person did not have individual names on them. There was no evidence Mr. Matos received transaction receipts displaying and individual's name, or that another person's name appeared while he was making purchases. Fiz was the owner of the blue HP laptop, the encoding device, and had the Rescator account. Monzon used Fiz' account and transmitted money overseas to Ukraine at Fiz' direction. There was no evidence presented that Mr. Matos was involved in transmitting money overseas to Ukraine for the purchase of credit card numbers.

Mr. Matos' actions in this case show he lacked the requisite intent to defraud. After Mr. Matos was arrested, he was provided his *Miranda* rights in Spanish, and he agreed to speak with law enforcement about his trip to Idaho. Similarly, his conduct in using the cards evidenced no stealthy purpose. There was no evidence of him using a false identification. He used the cards during normal store hours, and took no surreptitious actions.

Even viewing the evidence in the light most favorable to the Government, there is insufficient evidence that he agreed to become a member of a wire fraud scheme or knew of its objectives and intended to help, or that he knew he was participating in a scheme to defraud with the specific intent to defraud. The convictions for conspiracy to commit wire fraud and wire fraud should be reversed due to the legal insufficiency of the evidence.

### III. THE OTHER ACT EVIDENCE CONCERNING PRIOR FRAUDULENT TRIPS WAS INADMISSABLE PURSUANT TO F.R.E 404(b) AND 403

Whether the district court erred in permitting the Government to introduce other act evidence pursuant to F.R.E. 404(b) is reviewed for abuse of discretion. *United States v. Romero*, 282 F.3d 683 (9th Cir. 2002).

#### A. The District Court Erred In Admitting The Testimony Of A Cooperating Defendant Concerning Prior Fraudulent Trips

Federal Rule of Evidence 404(b) renders inadmissible "[e]vidence of a crime, wrong or other act" to prove the character or criminal propensity of a defendant. However, such evidence is allowed if offered "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id*. For other act evidence to be admitted for these purposes, it must: 1) tend to prove a material point; 2) not be too remote in time; 3) be based upon sufficient evidence to support a finding that the defendant committed the other act; and 4) be similar to the offense charged. *United*

*States v. Banks*, 514 F.3d 959, 976 (9th Cir. 2008). "Even if the proffered evidence satisfies these requirements, the district court should decline to admit it if its probative value is substantially outweighed by the danger of unfair prejudice." *Id*. (quotations omitted). Thus, analysis under F.R.E. 404(b) requires a F.R.E. 403 analysis as well.

In this case, defense counsel objected to the Government eliciting testimony from Fiz concerning the alleged prior fraudulent trips by codefendants pursuant to F.R.E. 404(b) and 403. *Id*. at pp. 64-79, 84-85. The district court overruled these objections and allowed the Government to introduce Fiz' testimony. *Id*.

The Government met with Fiz in July of 2016, and on November 17, 2016. *Id*. at p. 65. During the July meeting, Fiz disclosed a general description of his knowledge that Defendants had committed prior fraudulent trips. *Id*. On November 17, 2016, Fiz made specific statements about trips to Oklahoma, Kansas, Texas, and Utah, and that he made these trips with some or all of Defendants. *Id*. On November 18, 2016, the Government filed notice pursuant to 404(b), that it intended to introduce testimony concerning these prior trips. *Id*.; [Dkt. 127]. According to the Government, the non-propensity purpose for admitting the testimony was to establish knowledge. *Id*. at pp. 75-76. However, the interview memorandum detailing the conversation with Fiz on November 17th, was not disclosed to the defense until the morning of the first day of trial. *Id*. at p. 65. The

404(b) notice did not describe which Defendant allegedly participated in prior trips. The dates and locations of these prior fraudulent trips, and which Defendant allegedly attended, was detailed in the November 17th interview memorandum. *Id*. at p. 73.

The Court was advised that Fiz and Monzon's positions concerning prior trips were in conflict: "This cooperator is saying that these Co-Defendants had gone on prior trips. While the other cooperator is saying, I've gone on prior trips with Mejias-Fiz, but none of these guys went." *Id*. at p. 74. In response, the Government suggested, "if I'm Defense counsel I'm happy the two cooperators have statements that are somewhat at odds. I don't know if that's an issue at all." *Id*.

In overruling the objections, the district court found, it was initially inclined to find the evidence might be unduly prejudicial under Rule 403. *Id*. at p. 77. However, the district court stated, "having read the brief that was filed by the Government and the case law cited therein, I now believe that this is evidence that should come before the jury under 404(b)." *Id*. The district court specified the evidence was relevant to show a pattern of activity, knowledge, and identity. *Id*. The district court noted it preferred notice be given earlier, but found the defense had not been taken by surprise. *Id*. at pp. 77-78. Finally, the district court noted the

issue concerning the two cooperators' credibility was an issue for the jury. *Id*. at p. 78.

The district court erred in overruling the objection to Fiz' proffered testimony concerning the alleged prior trips with Defendants.

First, there was insufficient evidence to support a finding that Mr. Matos attended prior fraudulent trips, and the district court did not address this issue. While the district court correctly stated Fiz and Monzon's credibility was an issue for the jury, the information the district court had was that Fiz and Monzon's testimony concerning prior trips conflicted. Fiz stated that he had been on prior trips with some or all of the Defendants, while Monzon stated he had only been on prior trips with Fiz. Thus, the only evidence to support a finding that Mr. Matos attended prior fraudulent trips was Fiz' potential testimony, which was not corroborated by Monzon, or any other evidence. There was insufficient evidence to support a finding that Mr. Matos went on prior trips.

Second, the district courts finding that the defense was not unduly prejudiced by the disclosure of Fiz' November 17th statements was improper. The district court correctly noted that it initially intended to rule the evidence was inadmissible pursuant to Rule 403, however, after reviewing the Government's memorandum and case law, it overruled the objections. Mr. Matos was unaware Fiz intended to implicate him concerning prior trips, because disclosure of the

dates, locations, and the Defendants did not occur until the first day of trial. At the time of his arrest, Mr. Matos had only been living in the U.S. for approximately four months. Thus, dates, locations, and the allegation that he attended any prior fraud trips with Fiz was critical disclosure. Mr. Matos was prejudiced by the late disclosure and inability to file a responsive memorandum of law supported by case law and records.

There was no probative value for Fiz' testimony, other than to establish propensity. Even if the district court was correct in finding the proffered testimony was relevant for a non-propensity purpose, the relevance was slight when weighed against the prejudicial impact of this potential testimony. As the Government pointed out, the testimony was "very important to show knowledge because if the Defendants are saying, I don't know what I was doing here other than to go to a baby shower, the fact that they committed fraud on other occasions with the same cooperators defeats the argument . . . ." *Id*. at p. 76. To establish Mr. Matos' knowledge, the Government's case turned on testimony of one witness, who was trading his testimony in hopes of a lesser sentence.

Based upon the above, it is appropriate for this Court to find the district court abused its discretion in admitting Fiz' testimony pursuant to Rules 404(b) and 403.

**B. The District Court's Error Was Not Harmless**

Where the district court's error is of a nonconstitutional magnitude, the Court must reverse "unless it is more probable than not that the error did not materially affect the verdict." *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997) (en banc) (internal citation and quotation omitted). The burden to show the harmlessness of the error is on the party benefitting from the error. *Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005).

It is more probable that the district court's erroneous ruling materially affective the verdict in this case, and contributed to Mr. Matos' conviction. As addressed above, the evidence in this case was primarily circumstantial. The Government was largely relying on Fiz' testimony to establish Mr. Matos' knowledge and intent in this case. While the jury foreperson indicted that the jury did not find Fiz or Monzon credible, the lack of evidence against Mr. Matos concerning his knowledge and intent demonstrates the jury likely considered the prior trip testimony in its deliberations. Therefore, Mr. Matos' convictions in this case should be reversed.

## CONCLUSION

For the reasons set forth above, this Court should hold there was insufficient evidence to convict Mr. Matos for aggravated identity theft, conspiracy to commit wire fraud, and wire fraud. Further, the district court erred in admitting other act

evidence testimony concerning prior fraudulent trips, and this error was not harmless. Therefore, Mr. Matos' convictions should be reversed.

## STATEMENT OF RELATED CASES

Counsel is unaware of any pending related cases in this Court within the meaning of Ninth Circuit Rule 28-2.6, as to Case No. 17-30056.

**Certificate Of Compliance Pursuant To Fed. R. App. P. 32(a)(7)(C)
and Circuit Rule 32-1**

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening brief is proportionately spaced, has a typeface of 14 points or more and contains 6,567 words.

DATED this 20th day of July, 2017.

s/ DARTANYON G. BURROWS

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of July, 2017, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system which sent a notice of electronic filing to all parties on the electronic mail notice list, specifically to:

Joshua D. Hurwit, Assistant US Attorney
Office of the United States Attorney
Washington Group Plaza IV, 800 Park Blvd. Ste 600
Boise, ID  83712

Melissa Lout, Assistant US Attorney
Office of the United States Attorney
Washington Group Plaza IV, 800 Park Blvd. Ste 600
Boise, ID  83712


s/ DARTANYON G. BURROWS